UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

IN RE:                                          CHAPTER 7
                                                CASE NO. 1-09-13438-MJK
NANODYNAMICS, INC.                              HON. MICHAEL J. KAPLAN

                    DEBTOR.

MARK S. WALLACH, AS CHAPTER 7 TRUSTEE
OF NANODYNAMICS, INC.,

                    PLAINTIFF,                  ADV. PRO. NO. 1-11-01078-MJK

        vs.

ALLAN ROTHSTEIN,

                    DEFENDANT.

### AMENDED ADVERSARY COMPLAINT FOR (i) AVOIDANCE AND RECOVERY OF PREFERENTIAL AND FRAUDULENT TRANSFERS AND (ii) DISALLOWANCE OF CLAIMS

Mark S. Wallach, the chapter 7 Trustee of Nanodynamics, Inc., by and through his special counsel, HARTER SECREST & EMERY LLP, as and for his amended complaint against the defendant, Allan Rothstein, alleges as follows:

### I. PROCEDURAL HISTORY

1.      On July 27, 2009 ("Petition Date"), the debtor, Nanodynamics, Inc. ("Debtor"), filed a voluntary petition for relief pursuant to chapter 7 of title 11 of the United States Code ("Bankruptcy Code") in the United States Bankruptcy Court for the Western District of New York ("Bankruptcy Court") [Docket No. 1].

2.      On or about July 27, 2009, Mark S. Wallach was appointed to serve as the chapter 7 trustee for Debtor's case ("Plaintiff" or "Trustee") [Docket No. 7].

3. On July 16, 2012, this Court entered a Decision and Order Denying Dismissal Motion in Part and Granting it in Part (but with Leave to Amend the Complaint) ("Dismissal Order") [AP Docket No. 28]. The Plaintiff now submits this Amended Complaint in response to, and accordance with, the Dismissal Order.

## II. PARTIES

4. Upon information and belief, the defendant, Allan Rothstein ("Defendant"), is a former director, officer and/or chairperson of the Debtor, and subsequently served as an outside consultant to the Debtor, and currently resides at 105 West 29th Street, Apt. 44G, New York, New York.

## III. JURISDICTION & VENUE

5. This proceeding is brought in accordance with FED. R. BANKR. P. 7001 and seeks the following relief: (1) avoidance and recovery of preferential and fraudulent transfers pursuant to 11 U.S.C. §§ 544, 547, 548 and 550; and (2) disallowance of claims pursuant to 11 U.S.C. § 502.

6. This Court has jurisdiction over the parties and subject matter of this proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

7. This action is a core proceeding as defined under 28 U.S.C. § 157(b)(2).

8. This Court is the proper venue for this proceeding pursuant to 28 U.S.C. § 1409(a).

## IV. FACTUAL BACKGROUND

### A. Lease, Service & Consulting Agreements

9. Upon information and belief, Defendant served as a director, officer and/or chairperson of the Debtor since its formation as a Delaware corporation in March 2002, until April 26, 2007, as detailed below.

10. On November 17, 2004, the Debtor entered into a *Standard Form of Office Lease* with 98 CM Corp. c/o J.Z. Cutter Management Corp., as landlord, for property known as 98 Cutter Mill Road, Suites 368 and 370, Great Neck, New York 11021 ("Leased Property"), a true and accurate copy of which is attached hereto as **Exhibit A**.

11. On April 1, 2005, the Debtor entered into a *Services Agreement* with Virgence Group LLC ("Virgence"), for investor relations, corporate communications, marketing, financial analysis and other related services, a true and accurate copy of which is attached hereto as **Exhibit B**. As consideration for the services, the Debtor agreed to provide Virgence with access to and use of 66.67% of the Leased Property; thus, leaving 33.33% for the benefit of the Defendant.

12. Effective April 26, 2007, Defendant "resigned as a Director and Officer of the [Debtor]…citing the proposed public offering and conflicts that will exist between his role with the Company and other business interest if he remains as Chairman of the [Debtor] after its common stock is publicly traded," but remained one of the largest shareholders of the Debtor, as reflected in the Debtor's *Statement of Financial Affairs* [Docket No. 1] and corporate minutes for May 1, 2007, attached hereto as **Exhibit C**.

13. Effective May 1, 2007 ("Effective Date"), the Debtor and Defendant entered into a *Consulting Agreement* – a true and accurate copy is attached hereto as **Exhibit D** – for the Defendant to perform the following "Services" over a 3-year term:

> [Defendant] shall consult with [Debtor]'s Chief Executive Officer ("CEO") and such other members of senior management of [Debtor] as CEO designates with regard to various transactions in which [Debtor] may be involved, such as product or technology licensing arrangements, research and development sponsorships, mergers, acquisitions, joint ventures and any other transaction reasonably requested and specifically identified in writing by [Debtor] (a "Transaction"). [Defendant] will advise and assist [Debtor] in the court of its negotiations of any Transaction(s) and, if requested by [Debtor], will participate directly in such negotiations.

14. The Consulting Agreement provided for compensation over the 3-year term as follows: (a) quarterly installments of $13,500.00; (b) reimbursement of "reasonable and necessary expenses"; (c) continued payment for the Leased Property; and (d) contingent fees based on successful transactions involving the Defendant. *See* **Exhibit D**.

### B. No Business Purpose & Defendant Nonperformance

15. Upon information and belief, the Debtor never used the Leased Property for any of its own business purposes. Rather, the Debtor maintained at least 33.33% of the Leased Property exclusively and solely for the Defendant's personal use, with no tangible direct or indirect benefit to the Debtor.

16. Accordingly, on August 14, 2009, the Trustee filed a Motion to Reject to Real Property Lease regarding the Leased Property [Docket No. 29] ("Rejection Motion"), which provided as follows (emphasis added):

> [Trustee] has been informed by Diane McMahon, Esq. and William E. Cann, who have been appointed Special Counsel and Consultant to the Trustee respectively…that the [Leased Property] was for the primary benefit of [Defendant], a shareholder and Board member of the Debtor, and that said premises was used primarily for the benefit of [Defendant] and his varied business interests…***the Debtor conducted no meaningful operations out of the subject leased premises*** and, accordingly, there is no benefit whatsoever to the Bankruptcy Estate to assume the subject lease.

17. On August 26, 2009, the Bankruptcy Court entered an Order granting the Trustee's Rejection Motion [Docket No. 51].

18. Upon information and belief, the Defendant failed to materially perform any of the "Services" required under the Consulting Agreement between May 1, 2007, and the Petition Date, as evidenced by the Debtor's lack of successful operations, long-term insolvency and eventual Chapter 7 filing.

19. Although the Defendant alleges substantial performance under the Consulting

Agreement, the corporate records do not reflect any tangible (i.e. financial) benefit to the Debtor during the Defendant's tenure as a "Consultant." In fact, per the Defendant's failure to solicit direct capital investment, the Debtor was forced to obtain loans via promissory notes from various shareholders, including the Defendant, as reflected in the Debtor's *Schedule G* [Docket No. 1].

20. As detailed in Part IV.E. below, the Debtor was insolvent when the Defendant became a "Consultant" in May 2007, and its financial condition only worsened thereafter – minimal revenues far exceeded by substantial losses, failed initial public offering, constant lack of capital and "overdue accounts payable" – culminating in the Debtor's Chapter 7 filing just over two (2) years later.

### C. Debtor Payments

21. In accordance with the Consulting Agreement, between the Effective Date and Petition Date, the Debtor provided payments to the Defendant for alleged consulting fees in the total amount of $163,001.75, approximately $122,501.75 of which was paid during the 2-year period starting on July 27, 2007, as reflected in the account ledger attached hereto as **Exhibit E**.

22. Between November 2005 and the Petition Date, the Debtor made payments for the Leased Property in the total amount of $386,667.32, of which 33.33% or $128,876.21 was solely to the Defendant's benefit, as reflected in the account ledger attached hereto as **Exhibit F**.

### D. Defendant as Insider – Statutory & Non-Statutory

23. In accordance with 11 U.S.C. § 101(31)(B), there is no dispute that the Defendant was a statutory "insider" of the Debtor, for the period from the Debtor's formation in March 2002, through the Defendant's resignation on April 26, 2007.[1]

24. Although formally resigning as a director and officer, the Defendant: (i) remained

---

[1] *See* ¶ 8 of Defendant's Answer [AP Docket No. 12].

a significant shareholder of the Debtor; (ii) maintained a very close relationship with the Debtor; (iii) held extensive knowledge of the Debtor's operations and financial condition; and (iv) engaged in transactions with the Debtor that were not arm's length. As a result, the Defendant was clearly a "non-statutory insider" of the Debtor.[2]

25. On or about February 1, 2008, the Defendant made a short-term loan to the Debtor to cover operating expenses (i.e. payroll), due to the Debtor's lack of capital, as evidenced by a certain *Promissory Note* in the principal amount of $500,000.00, in favor of the Debtor ("Note"), a true and accurate copy of which is attached hereto as **Exhibit G**.

26. The circumstances surrounding the Note clearly show that it was ***not*** an arm's length transaction, and further evidence the Debtor's insolvency. First, upon information and belief, conventional loan facilities were not available to the Debtor; thus, it was compelled to obtain the loan from the Defendant, an alleged "Consultant" who just happened to be the former "Chairman of the Company" (*See* **Exhibit C**). Second, the Note does not contain many of the standard terms or provisions generally associated with such a significant monetary transaction – no warranties or representations by either party, no defined payment schedule or structure, no payment method or location designated, no security interest or collateral provided, etc.

27. The fact that the Defendant provided this short-term loan when the Debtor was clearly not creditworthy supports the allegation of the Defendant's 'insider' status; certainly, no one but an 'insider' would have granted this loan upon such undefined terms, in order to prevent the Debtor from imminent collapse.

### E. Insolvency of Debtor

28. Pursuant to 11 U.S.C. §§ 101(32), 547 and applicable case law, it is presumed that

---

[2] "[C]ourts have identified a category of creditors, sometimes called 'non-statutory insiders,' who fall within the definition but outside of any of the enumerated categories." *Bruno Mach. Corp. v. Troy Die Cutting Co.* (*In re Bruno Mach. Corp.*), 435 B.R. 819, 833 (NDNY 2010) (quoting *Schubert v. Lucent Techs. Inc.* (*In re Winstar Comm.*), 554 F.3d 382, 395 (3d Cir. 2009)).

the Debtor was insolvent during the 90-day preference period leading up to the Petition Date – April 28, 2009, through July 26, 2009.

29. Throughout the Debtor's existence, it was a research and development company, whose goal was to create products and sell them to manufacturers and/or distributors for resale, including governmental agencies and the military. Unfortunately, the Debtor was *never* able to successfully create any product for commercial sale; namely, none of the Debtor's products were ever established as marketable.

30. The only material asset that the Debtor ever created and possessed was intellectual property, but as evidenced by the Debtor's settlement with Nano-Applications Holdings B.V., those items had little to no fair market value.

31. As a result, the Debtor *never* had any stream of revenue or income, but survived on either funds from investors or government-based grants.

32. The Debtor's long-term insolvency, failed financing efforts and deteriorating position, particularly since 2005, are all reflected in the minutes from Board of Directors' meetings attached hereto as **Exhibit H** (collectively "Minutes") (emphasis added in the excerpts below):

> (a) September 14, 2005 – "For the First Half of 2005, [Debtor] had revenues of $1.6M primarily from government grants and development services and generated a *net loss of $4.0M*";
>
> (b) August 29, 2007 – Bill Cann, the Debtor's CFO, "forecasted that 2007 revenues will be approximate[ly] $6.6MM versus $4.4MM in 2006 with *losses of approximately $16MM for 2007 versus $15MM in 2006*";
>
> (c) January 21, 2008 – "*Government contracts continue to be substantially all of the revenues of the Company*…balance sheet shows $1.1MM of cash at

year end…should be sufficient to complete the Dubai offering but management is in conversations with its private investor base to obtain bridge financing, if necessary…This was in issue with Deloitte and additional language regarding liquidity has been added to the Prospectus…cash flow statement also shows the ***reduction in the [Debtor's] cash position as well as an impairment for certain assets during 2007***";

(d) February 19, 2008 – With regard to the failed initial public offering in Dubai, the Debtor was "advised that ***the offering had not sold out*** and that there was only approximately $20MM of committed investment…[Debtor] ***voluntarily delisted its shares in advance of initial trading*** to avoid delisting by the DIFX after the fact in light of Global Crown's [improper] actions";

(e) April 7, 2008 – "The 2008 budget anticipates revenues [of] $7.2MM with an ***operating loss of $13.7MM***…If $20MM of capital is raised during the year, there will be approximately $10MM of cash remaining at year end that should meet the [Debtor's] cash needs until the end of 2009";

(f) June 17, 2008 – "The ***balance sheet shows low cash and high payables***…Staff is negotiating with vendors and all vendors are under 90 days with the exception of certain service providers (ex. attorneys, printers)…[CFO] advised that any financing alternative would need to provide at least $8MM by the end of July to postpone or withdraw from the reverse merger but even that sum does not address the longer term needs of the [Debtor] for capital investment in production facilities";

(g) August 12, 2008 – "The [Debtor's] ***unrestricted cash will be fully expended as of next week***…Management is currently exploring opportunities for bridge

loan financing from several sources";

(h) September 29, 2008 – "The current cash situation is that the [Debtor] has $100,000 in its operating account…*needs $5MM in the next 30 days and $10MM in the next ninety days* to satisfy its vendors and to fund its operations until next April";

(i) October 22, 2008 – "The current cash situation is that the [Debtor] has $200,000 in its operating account and is negotiating a bridge loan of $1,000,000 with one of our shareholders…*overdue accounts payable are approximately $3.3MM and current payables are approximately $600,000*," and with regard to investment efforts, "If less than the $15MM is raised, the Company may be required to sell off rights in its products probably by geographic areas…*If no moneys are raised, the [Debtor] would be required to liquidate*";

(j) November 20, 2008 – With regard to the "$10MM debenture by Shell Technology Ventures…the *call for acceleration and repayment occurred on November 10, 2008*"; and

(k) January 30, 2009 – "Management will meet with several large shareholders [] next week to try to leverage the Gargesh Investment for an additional $1-2MM…*If these investments cannot be realized, the [Debtor] will be forced to layoff its workforce next week*…Management has also undertaken certain steps to be prepared in the event of a liquidation or bankruptcy of the [Debtor] if financing cannot be secured to sustain operations…Management met with and is in the process of retaining insolvency counsel."

33. The Debtor's consolidated 'Balance Sheet' and 'Statement of Operations' present a general overview of the various problems referenced in the Minutes, true and accurate copies of which are attached hereto as **Exhibit I**.

## V. CAUSES OF ACTION

### COUNT I

**Avoidance of Preferential Transfers – 11 U.S.C. § 547**

34. Plaintiff re-alleges and incorporates the preceding paragraphs of this Complaint, as if fully set forth herein.

35. All payments for alleged consulting fees under the Agreement and the Leased Property (collectively "Transfers") were property, or interests in property, of the Debtor. *See* **Exhibit E** and **Exhibit F**.

36. At all relevant times, the Defendant was ostensibly a creditor of the Debtor, as defined in 11 U.S.C. § 101(10).

37. The Transfers were made by Debtor to or for the benefit of the Defendant.

38. The Transfers were made on account of an antecedent debt owed by Debtor to the Defendant before the Transfers occurred.

39. As set out in Part IV.E. above, the Transfers were made while Debtor was insolvent. First, pursuant to 11 U.S.C. §§ 101(32), 547 and applicable case law, it is presumed that the Debtor was insolvent during the 90-day preference period leading up to the Petition Date – April 28, 2009, through July 26, 2009. Second, from one (1) year to 90 days before the Petition Date, the Minutes for that period clearly reflect the Debtor's insolvency – complete lack of capital, "overdue accounts payable," preparations for bankruptcy/liquidation, meeting with insolvency counsel, etc.

40. Despite the Defendant's formal resignation, he: (i) remained a significant

shareholder of the Debtor; (ii) maintained a very close relationship with the Debtor; (iii) held extensive knowledge of the Debtor's operations and financial condition; and (iv) engaged in transactions with the Debtor that were not arm's length. As a result, the Defendant qualified as a "non-statutory insider" of the Debtor.

41. A portion of the Transfers were made within one (1) year of the Petition Date.

42. The Transfers enabled the Defendant to receive more than he would have received: (i) under the Debtor's Chapter 7 bankruptcy; (ii) if the Transfers had not been made; and (iii) if the Defendant received payment of the underlying debt to the extent provided by the Bankruptcy Code.

43. Accordingly, certain of the Transfers are avoidable preferential transfers pursuant to 11 U.S.C. § 547. In particular, a chart summarizing the Transfers attributable to each of the Plaintiff's causes of action against the Defendant is attached hereto as **Exhibit J**.

## COUNT II

### Avoidance of Fraudulent Transfers – 11 U.S.C. § 548

44. Plaintiff re-alleges and incorporates the preceding paragraphs of this Complaint, as if fully set forth herein.

45. The Transfers were all property, or interests in current and future property, of the Debtor. See **Exhibit E** and **Exhibit F**.

46. A significant portion of the Transfers all took place within two (2) years of the Petition Date.

47. There is no evidence that the Debtor ever received any benefit or a reasonably equivalent value in exchange for the Transfers.

48. As set out in Part IV.E. above, the Transfers were made while Debtor was insolvent. First, pursuant to 11 U.S.C. §§ 101(32), 547 and applicable case law, it is presumed

that the Debtor was insolvent during the 90-day preference period leading up to the Petition Date – April 28, 2009, through July 26, 2009. Second, from two (2) years to 90 days before the Petition Date, the Minutes for that period reflect the Debtor's perpetual insolvency – revenues less than half of losses, failed initial public offering, ongoing lack of capital, "overdue accounts payable," considerations of bankruptcy/liquidation, etc.

49. Alternatively, per the Consulting Agreement and Defendant's status as a statutory and then non-statutory insider, the Debtor made the Transfers to or for the benefit of an insider under an employment contract and not in the ordinary course of business.

50. Accordingly, a significant portion of the Transfers are avoidable as fraudulent transfers pursuant to 11 U.S.C. § 548. *See* **Exhibit J**.

## COUNT III

**Avoidance of Fraudulent Transfers – 11 U.S.C. § 544 / N.Y. Debt. & Cred. Law § 273**

51. Plaintiff re-alleges and incorporates the preceding paragraphs of this Complaint, as if fully set forth herein.

52. Pursuant to 11 U.S.C. § 544(b), upon commencement of this case, Plaintiff has the right to avoid any transfer that is voidable under applicable law. In this case, Plaintiff also relies upon N.Y. Debt. & Cred. Law § 273 to avoid any constructive fraudulent transfers.

53. The Debtor received neither direct benefit from, nor a reasonably equivalent value in exchange for, the Transfers.

54. As set out in Part IV.E. above, the Debtor was and became further insolvent as a result of the Transfers. First, pursuant to 11 U.S.C. §§ 101(32), 547 and applicable case law, it is presumed that the Debtor was insolvent during the 90-day preference period leading up to the Petition Date – April 28, 2009, through July 26, 2009. Second, from four (4) years to 90 days before the Petition Date, the Minutes for that period reflect the Debtor's perpetual insolvency –

revenues equal to less than half of losses, failed initial public offering, ongoing lack of capital, "overdue accounts payable," considerations of bankruptcy/liquidation, etc.

55. Accordingly, all of the Transfers are avoidable as fraudulent transfers pursuant to 11 U.S.C. § 544 and N.Y. Debt. & Cred. Law § 273. See **Exhibit J**.

## COUNT IV

### Recovery of Property – 11 U.S.C. § 550

56. Plaintiff re-alleges and incorporates the preceding paragraphs of this Complaint, as if fully set forth herein.

57. Defendant was the initial transferee of the Transfers, or the person for whose benefit the Transfers were made.

58. Plaintiff is entitled to avoid the Transfers as preferential and/or fraudulent transfers pursuant to 11 U.S.C. §§ 544, 547 and 548.

59. Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover from the Defendant an amount, to be determined at trial, that is not less than the sum and/or value of the Transfers.

## COUNT V

### Disallowance of Claims – 11 U.S.C. § 502(d)

60. Plaintiff re-alleges and incorporates the preceding paragraphs of this Complaint, as if fully set forth herein.

61. Defendant is the initial transferee of the Transfers, or the person for whose benefit the Transfers were made, which are avoidable as preferential and/or fraudulent transfers under 11 U.S.C. §§ 544, 547 and 548, and thus, recoverable by the Plaintiff under 11 U.S.C. § 550.

62. Pursuant to 11 U.S.C. § 502(d), any and all claims held by the Defendant against the Debtor should be disallowed, including the Defendant's general unsecured claim for $532,315.07 [Claim No. 64], unless the Defendant pays an amount equal to the sum and/or value

of the Transfers.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following:

A. Avoidance of the Transfers as preferential transfers pursuant to 11 U.S.C. § 547;

B. Avoidance of the Transfers as fraudulent transfers pursuant to 11 U.S.C. § 548;

C. Avoidance of the Transfers as fraudulent transfers pursuant to 11 U.S.C. § 544 and N.Y. Debt. & Cred. Law § 273;

D. Judgment against Defendant in an amount to be determined at trial, but no less than the sum and/or value of the Transfers, including pre-judgment interest, costs and attorneys' fees, pursuant to 11 U.S.C. § 550;

E. Disallowance of any and all claims held by Defendant against Debtor pursuant to 11 U.S.C. § 502(d), unless Defendant pays an amount equal to the sum and/or value of the Transfers; and

F. Such other and further relief as this Court deems proper.


Dated: August 24, 2012　　　　　　　　**HARTER, SECREST & EMERY LLP**
　　　　　Buffalo, New York

　　　　　　　　　　　　　　　　　　　By:　*/s/ Raymond L. Fink*
　　　　　　　　　　　　　　　　　　　　　　Raymond L. Fink, Esq.
　　　　　　　　　　　　　　　　　　　　　　John A. Mueller, Esq.
　　　　　　　　　　　　　　　　　　　　　　• *Special Counsel to Mark S. Wallach, as Chapter 7 Trustee of Nanodynamics, Inc.*
　　　　　　　　　　　　　　　　　　　　　　Twelve Fountain Plaza, Suite 400
　　　　　　　　　　　　　　　　　　　　　　Buffalo, New York  14203-2835
　　　　　　　　　　　　　　　　　　　　　　Tel:  (716) 853-1616
　　　　　　　　　　　　　　　　　　　　　　rfink@hselaw.com
　　　　　　　　　　　　　　　　　　　　　　jmueller@hselaw.com